12-1723-cv
SEC v. Contorinis

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2013

(Argued: October 7, 2013     Decided: February 18, 2014)

Docket No. 12-1723-cv

————————

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

— v. —

JOSEPH CONTORINIS,

*Defendant-Appellant.*[*]

————————

B e f o r e :

LYNCH, CHIN, and CARNEY, *Circuit Judges*.

————————

————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform with the caption above.

Defendant appeals from a judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*), ordering him to disgorge all profits generated by insider trading, enjoining him from future violations of the securities laws, and ordering him to pay prejudgment interest on the disgorgement amount. Defendant was convicted at a criminal trial of securities fraud and conspiracy to commit securities fraud, based on his use of inside information to trade on behalf of an investment fund of which he was Managing Director. Subsequently, in this civil enforcement action, the district court granted the SEC's motion for summary judgment and, among other forms of relief, ordered defendant to disgorge all profits made by the insider trades, including those profits that accrued to the fund rather than to defendant personally. Because a tipper can be required to disgorge all gains obtained by his tippees through illegal insider trading even without direct economic benefit to the tipper, and because defendant gave the fund the benefit of his inside information just as does a tipper, we hold the district court did not abuse its discretion by ordering the defendant to disgorge all profits. We similarly identify no abuse of discretion in the district court's orders directing payment of prejudgment interest and issuing an injunction.

2

AFFIRMED.

Judge Chin dissents in a separate opinion.

———————————

ALLAN A. CAPUTE (Anne K. Small, Michael A. Conley, Jacob H. Stillman, *on the brief*), Securities and Exchange Commission, Washington, D.C., *for Plaintiff-Appellee.*

ROBERTO FINZI (Theodore V. Wells, Jr., Mark F. Pomerantz, Farrah R. Berse, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellant.*

———————————

GERARD E. LYNCH, *Circuit Judge*:

Joseph Contorinis appeals from a judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *Judge*) ordering him to disgorge $7,260,604 in profits from illegal insider trading, enjoining him from further violating the securities laws, and ordering him to pay prejudgment interest on the entire disgorgement amount. The primary issue presented is whether an insider trader who trades on behalf of another person or entity using funds he does not own, and thus produces illegal profits that he does not personally realize, can nevertheless be required to disgorge the full amount of illicit profit he generates from his illegal and fraudulent actions. Because our

3

cases have established that tippers can be required to disgorge profits realized by their tippees' illegal insider trading, and this case is distinguishable only insofar as Contorinis himself executed the fraudulent trades rather than leave that task to a tippee, we conclude that the district court was empowered to enter the disgorgement order, and did not abuse its discretion in doing so. Additionally, we find no abuse of discretion in the district court's imposition of an injunction on Contorinis or in its order that Contorinis pay prejudgment interest on the disgorgement amount. We therefore affirm the district court's decision.

## BACKGROUND

Defendant-appellant Joseph Contorinis, a Managing Director at Jeffries & Company, Inc. ("Jeffries"), executed several illegal insider trades involving the stock of the supermarket chain Albertson's, Inc. ("Albertson's"), using material nonpublic information received from Nicos Stephanou, an employee of UBS Investment Bank ("UBS"). The offense had its origins in September 2005, when Stephanou informed Contorinis that UBS would be advising on a major financial acquisition involving Albertson's. As a UBS employee involved in the transaction, Stephanou was privy to confidential material information regarding the acquisition, and Contorinis asked Stephanou to keep him apprised of developments.

4

In January 2006, as negotiations involving the acquisition of Albertson's unfolded, Stephanou on several occasions disclosed material inside information regarding the acquisition to Contorinis before the information became public. Relying on that information, Contorinis made several opportune trades in Albertson's stock. Contorinis did not execute these trades with his personal assets, but rather did so on behalf of the Jeffries Paragon Fund (the "Paragon Fund"), of which Contorinis was a co-manager and over which he had investment control. As a result of these insider trades the Paragon Fund realized profits of $7,304,738, and avoided losses of $5,345,700.

In February 2009, Contorinis was indicted on one count of conspiracy to commit securities fraud and nine counts of securities fraud. A jury found him guilty of the conspiracy and of seven counts of securities fraud, and on October 6, 2010, he was sentenced to six years of imprisonment and ordered to pay $12,650,438 (the combined value of the Paragon Fund's realized profits and avoided losses) in criminal forfeiture penalties.

On appeal, this Court affirmed Contorinis's conviction but vacated the forfeiture order, remanding to the district court to redetermine the proper amount. United States v. Contorinis, 692 F.3d 136, 148 (2d Cir. 2012). We

5

observed that neither the language of the criminal forfeiture statute nor Circuit

case law supported the proposition that a defendant must forfeit proceeds that

"go directly to an innocent third party and are never possessed by the

defendant." <u>Id</u>. at 147.  Rather, criminal forfeiture penalties are "usually based

on the defendant's actual gain." <u>Id</u>. at 146.  The district court's initial forfeiture

calculation reflected the total benefit to the Paragon Fund, not the gains accruing

to Contorinis himself.  On remand, the district court found that Contorinis's

personal profit, in the form of linked compensation from the trades, amounted to

$427,875, and ordered forfeiture of that amount.

Following the filing of the criminal indictment, the Securities and Exchange

Commission ("SEC") brought this civil action against Contorinis in the United

States District Court for the Southern District of New York, seeking disgorgement

of $7,260,604 in unlawful profits obtained by the Paragon Fund (equivalent to the

total profit from insider trading less trading commission costs), as well as

additional civil monetary penalties and an injunction against future securities

law violations.  After Contorinis was convicted at his criminal trial, the SEC

moved for summary judgment, and Contorinis, without admitting to the

underlying offense, acknowledged that the jury verdict had a preclusive effect

requiring a finding of civil liability.  On February 3, 2012, the district court granted the SEC's summary judgment motion against Contorinis and granted relief in the forms requested by the SEC, permanently enjoining Contorinis from violating the securities laws in the future, ordering Contorinis to disgorge $7,260,604 (less any amount paid pursuant to the criminal forfeiture), and imposing a civil penalty of $1,000,000.  In a superseding judgment of February 29, 2012, the district court reaffirmed those penalties, and furthermore ordered Contorinis to pay $2,485,205 in prejudgment interest on the disgorgement amount.[1]

Contorinis timely brought this appeal, challenging the judgment insofar as it required him to disgorge the entire amount obtained by the Paragon Fund through insider trading and to pay prejudgment interest on the disgorgement amount, and permanently enjoined him from violating the securities laws.

---

[1] On September 24, 2013, the SEC informed the Court that the parties had agreed to adjust the prejudgment interest amount to reflect the fact that, after the sentence was imposed, Contorinis had posted $3,000,000 as bail, of which the government, and not Contorinis, had the use between October 7, 2010 and March 29, 2011.  That adjustment reduces the prejudgment interest award from $2,485,205 to $2,417,940.  The agreement did not resolve any of the other issues in dispute between the parties, including Contorinis's contention that he should not be required to pay prejudgment interest at all.  September 24, 2013 Letter, SEC v. Contorinis, No. 12-1723, ECF No. 122.

## DISCUSSION

I.    <u>Disgorgement of Profit Accruing to the Paragon Fund</u>

Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct.  <u>See</u> <u>SEC v. Fischbach Corp.</u>, 133 F.3d 170, 175 (2d Cir. 1997); <u>see also</u> <u>SEC v. Tome</u>, 833 F.2d 1086, 1096 (2d Cir. 1987) ("The paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing.").  Disgorgement is an equitable remedy, imposed to "forc[e] a defendant to give up the amount by which he was unjustly enriched." <u>FTC v. Bronson Partners</u>, 654 F.3d 359, 372 (2d Cir. 2011), quoting <u>SEC v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 102 (2d Cir. 1978).  By forcing wrongdoers to give back the fruits of their illegal conduct, disgorgement also "has the effect of deterring subsequent fraud."  <u>SEC v. Cavanagh</u>, 445 F.3d 105, 117 (2d Cir. 2006) ("<u>Cavanagh II</u>").  Because disgorgement does not serve a punitive function, the disgorgement amount may not exceed the amount obtained through the wrongdoing.  <u>Id.</u> at 116 n.25.  At the same time, however, as it operates to make the illicit action unprofitable for the wrongdoer, disgorgement need not serve to compensate the victims of the wrongdoing.

8

Bronson, 654 F.3d at 374.  Because disgorgement is not compensatory, it "forces a

defendant to account for all profits reaped through his securities law violations

and to transfer all such money to the court, even if it exceeds actual damages to

the victim."  Cavanagh II, 445 F.3d at 117.  Because disgorgement's underlying

purpose is to make lawbreaking unprofitable for the law-breaker, it satisfies its

design when the lawbreaker returns the fruits of his misdeeds, regardless of any

other ends it may or may not accomplish.

        "The district court has broad discretion not only in determining whether or

not to order disgorgement but also in calculating the amount to be disgorged."

SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996).  Accordingly,

we review a disgorgement order for abuse of that discretion.  SEC v. Posner, 16

F.3d 520, 522 (2d Cir. 1994).

        Contorinis argues that because he never personally controlled the profits

that accrued to the Paragon Fund – although he could make investment

decisions, he did not control disbursement of the proceeds – ordering him to

disgorge the entire amount gained through his insider trading is a misapplication

of the disgorgement principle.  The argument identifies an ambiguity in the

concept of disgorgement.  Disgorgement instantiates the equitable principle that

9

wrongdoers should not benefit from their misdeeds, and thus should relinquish

any profits obtained from them.  On the one hand,  Contorinis argues that

because he illegally traded not for his own account with his own funds, but

rather on behalf of an investment fund that he managed and whose assets

belonged to third-party investors, he did not personally enjoy the proceeds of the

resulting gain (beyond the increase in his compensation linked to the

performance of the Paragon Fund).  On the other hand, although Contorinis did

not pocket the profits from his trades, it was he who utilized the inside

information, executed the trades, and secured the resulting profit for the benefit

of his clients.  The question is thus posed whether an insider trader can be

required to disgorge not only the profit that he personally enjoyed from his

exploitation of inside information, but also the profits of such exploitation that he

channeled to friends, family, or clients.  Contorinis argues, in effect, that one can

only "disgorge" what one has personally "swallowed"; the SEC argues that a

fraudster should be compelled to return not only those profits from the fraud that

he has reserved for his own use, but also those that he has bestowed on others.

In resolving this dispute, we do not write on a clean slate.  Our prior cases

indicate that an insider trader may be ordered to disgorge not only the unlawful

10

gains that accrue to the wrongdoer directly, but also the benefit that accrues to

third parties whose gains can be attributed to the wrongdoer's conduct.  We have

long applied that principle in the tipper-tippee context.  Thus, in SEC v. Warde

we held that, in the determination of a disgorgement amount, "[a] tippee's gains

are attributable to the tipper, regardless whether benefit accrues to the tipper."

151 F.3d 42, 49 (2d Cir. 1998).  That principle has deep roots in parallel civil

remedial structures.  For example, in Elkind v. Ligget & Myers, Inc., 635 F.2d 156,

165 (2d Cir. 1980), we concluded that "[t]rades by tippees are attributed to the

tipper" in determining liability for damages, and in SEC v. Texas Gulf Sulphur

Co., 446 F.2d 1301, 1308 (2d Cir. 1971), the foundational case for insider trading

liability, we required a tipper to make common-law civil restitution "for the

profits derived by his tippees."[2]

---

[2]  In his dissenting opinion, Judge Chin attempts to distinguish the instant case
from our prior cases involving tippers by suggesting that tippers can be held
liable for tippees' gains because "the tipper and tippee are concerted actors,
jointly engaging in fraudulent activity."  Dissent, post, at 5.  We respectfully
disagree.  We have found tippers liable for tippees' gains without any indication
that the tippee acted in culpable concert with the tipper.  See, e.g., SEC v. Tex.
Gulf Sulphur Co., 401 F.2d 833, 852-53 (2d Cir. 1968) ("As [defendant tipper's]
'tippees' are not defendants in this action, we need not decide whether, if they
acted with actual or constructive knowledge that the material information was
undisclosed, their conduct is as equally violative of [Rule 10b-5] as the conduct of
their insider source, though we note that it certainly could be equally

That rule makes perfect sense.  A potential tipper in possession of inside
information who seeks to confer a benefit on a friend or to curry favor with
someone who can confer reciprocal benefits in the future can do so either by
trading on this information himself and passing the *profit* on to the intended
beneficiary, or by passing the *information* to the beneficiary and thus allowing the
tippee to realize the profit himself.  In the former case, the insider would
unquestionably be liable to disgorge the profit; disgorgement is required whether
the insider trader has put his profits into a bank account, dissipated them on
transient pleasures, or given them away to others.[3]  It would make little sense to

_____

reprehensible"); Tex. Gulf Sulphur, 446 F.2d at 1308 (in further legal proceedings,
same defendant tipper required to "make restitution for the profits derived by his
[non-defendant] tippees"); Elkind, 635 F.2d at 161 (tipper corporation held liable
for tippee traders' gains, even where non-party tippee traders' culpability was
never addressed).  Similarly, in Warde, 151 F.3d at 49, the defendant was
required to disgorge proceeds accruing to his wife's account, without any
indication his wife acted in concert with him.  Thus, the fact that "the Fund did
not act in concert with Contorinis," Dissent, post, at 7, has no bearing on whether
Contorinis can be held liable for the unlawful gains that he made on the Fund's
behalf.

[3] One ramification of this line of reasoning is that we have long deemed specific
tracing unnecessary in ordering disgorgement for securities fraud.  See Bronson,
654 F.3d at 374 (articulating the principle and collecting cases); see also SEC v.
Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000) ("[D]isgorgement is an
equitable obligation to return a sum equal to the amount wrongfully obtained,
rather than a requirement to replevy a specific asset").

allow the insider to escape disgorgement when he gives away not the proceeds of a trade predicated on his insider knowledge, but rather the knowledge itself to others who he knows will spin the information into gold by trading on it themselves.

But if that is so, and our precedents confirm that it is, it must follow that the insider who, rather than passing the tip along to another, directly trades for that other's account must equally disgorge the benefit he obtains for his favored beneficiary.  Indeed, that was the actual situation in <u>Warde</u>, in which the defendant utilized an account belonging to his wife, over which he had control, to make trades based on material nonpublic information.  151 F.3d at 49. Whether he traded on his own account and gave the profit to his wife, gave the information to his wife to enable her to trade on it, or executed the trades on his own authority using his wife's account such that the proceeds accrued to her, the wrong committed by the defendant would be the same, as would the economic result.  Whether the defendant's motive is direct economic profit, self-aggrandizement, psychic satisfaction from benefitting a loved one, or future profits by enhancing one's reputation as a successful fund manager, the insider trader who trades for another's account has engaged in a fraud, secured a benefit thereby, and directed the profits of the fraud where he has chosen them to go.

13

Thus, given our precedent establishing that tippers may be held liable to disgorge the gains of their tippees, it would be inconsistent to deny the district court the discretion to impose equivalent liability for conduct such as Contorinis's. Indeed, to the extent that this case can be distinguished from the tipper-tippee situation, the case for disgorgement is stronger here. The tipper in possession of material nonpublic information who passes that inside information to another, even with full knowledge that the tippee will use the information to trade, has no control over, and likely no knowledge of, the extent to which the tippee will trade. The tippee may make a modest wager or take a deep plunge; she may act at the ideal moment, or sacrifice some potential profit by trading prematurely or delaying too long. The tipper is liable for the tippee's gains, whatever they may be.

In contrast, Contorinis had *greater* control over the Paragon Fund's illegal profits than a tipper does over a tippee. Contorinis both obtained the inside information that facilitated the illegal trade and executed the trade on behalf of the Paragon Fund. He controlled the size and timing of the trades, and was then entirely responsible for the size of the Paragon Fund's gains. Moreover, it was Contorinis's *business* to make trades on behalf of the Paragon Fund. Not only did

14

he profit directly from the additional incentive compensation he received based on his successful (but corrupt) trades, but by making profitable trades on behalf of his clients he enhanced his reputation and increased the likelihood of his receiving future benefits as a fund manager.  In this way, Contorinis's case is even closer than a tipper's to the bedrock disgorgement case of the insider who executes illegal trades using his own money, and donates the profit to a third party.  There is no injustice, therefore, in making him responsible for the profits he made for others, as well as for himself, through his fraudulent insider trades.

It thus necessarily follows from existing Circuit precedent, and from the logic of the disgorgement remedy, that Contorinis may be held responsible for disgorgement of the Paragon Fund's illegal profits.  To conclude otherwise would permit greater liability in a relationship (tipper-tippee) which is, in all material respects, more tenuous than the relationship here (controlling manager-financial vehicle).  Our conclusion is required to maintain consistency in the remediation of securities law violations.

We thus conclude that the district courts possess discretion to allocate disgorgement liability for insider trading to those responsible for the illegal acts, including to those with investment power over third-party accounts used to

make illegal investments as well as to tippers.  Our conclusion prevents insider

traders from evading liability by operating through or on behalf of third parties.

As we said in <u>Warde</u>, in the absence of the discretion to allocate liability to

wrongdoers, "[t]he value of the rule in preventing misuse of inside information

would be virtually nullified [because] those in possession of such information,

although prohibited from trading for their own accounts, [would be] free to use

the inside information on trades to benefit their families, friends, and business

associates."  151 F.3d at 49.  <u>See also</u> <u>Tex. Gulf Sulphur</u>, 446 F.2d at 1308

("[W]ithout such a remedy, insiders could easily evade their duty to refrain from

trading on the basis of inside information.  Either the transactions so traded could

be concluded by a relative or an acquaintance of the insider, or implied

understandings could arise under which reciprocal tips between insiders in

different corporations could be given.").

We do not conclude that district courts *must* impose disgorgement liability

for insider trading upon wrongdoers when the gains accrue to innocent third

parties, but rather that the district courts *may* elect to do so in appropriate

16

circumstances.[4]  It is well established that district courts have broad discretion to impose disgorgement liability, First Jersey, 101 F.3d at 1474-75, and that liability should fall upon the wrongdoer in cases of uncertainty.  "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation. . . .  [A]ny risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty."  Id. at 1475, quoting SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995) (internal citation, quotation marks, and alterations in First Jersey omitted).

Contorinis's argument that he should be forced to disgorge only the amounts that he directly obtained as personal pecuniary benefit seeks to

---

[4]  When certain conditions are met, innocent third parties ("relief defendants") may be ordered to disgorge the proceeds generated by the illegal conduct of a fraudulent investor.  However, imposing such liability upon innocent third parties is elective rather than mandatory.  See, e.g., SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998) ("Cavanagh I") ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.") (emphasis added).  Here the SEC could have sought to recover illegal gains from the Paragon Fund as a relief defendant, but chose, as our case law has indicated is an established and legitimate alternative, to seek damages from the wrongdoer Contorinis directly.  While many factors may be relevant to deciding what remedies are appropriate in particular circumstances, we note that one argument in favor of requiring disgorgement from the trader is that he is culpable, while the third-party recipients, though unjustly enriched, may have been unaware of any wrongdoing.

17

undermine this discretion by conflating a central, well-established principle in

disgorgement law – that "the court may only exercise its equitable power only

over property causally related to the wrongdoing," SEC v. First City Fin. Corp.,

890 F.2d 1215, 1231 (D.C. Cir. 1989) – with the proposition, unsupported in our

case law, that the wrongdoer need disgorge only the financial benefit that accrues

to him personally.[5]  Yet as our consideration of the tipper-tippee context

---

[5]  No other circuit has spoken to the precise question of disgorgement liability for an
insider trader who had trading power but not disbursement control over a financial
vehicle whose funds were used to perpetuate the fraud.  Circuits which have
considered related issues are mixed regarding the extent to which a party can be
ordered to disgorge total gain from an unlawful act, when the party has not personally
received the full benefit of the wrongdoing.  A district court in the Sixth Circuit
concluded that "[w]hen addressing the amount of money [from fraudulent securities
transactions] that a defendant must disgorge, the Sixth Circuit has held, by implication,
that the entire amount of profits which were illicitly received must be disgorged."  SEC
v. Great Lakes Equities Co., 775 F. Supp. 211, 214 (E.D. Mich. 1991).  The court further
stated

> [t]he benefit or unjust enrichment of a defendant includes
> not only what it gets to keep in its pocket after the fraud, but
> also the value of the other benefits the wrongdoer receives
> through the scheme.  Thus, in insider trading cases, a tipper
> must disgorge not only his own profits but also any profits
> made by his tippees, even if the tipper did not receive any
> tangible kickback from those tippees.

Id.  To support this proposition, the district court cited, inter alia, SEC v. Blavin, which
states that "[d]isgorgement orders are not limited to the confiscation of trading profits . .
. The district court was well within its equitable power to 'make violations unprofitable'
. . . ."  760 F.2d 706, 713 (6th Cir. 1985), quoting SEC v. Manor Nursing Ctrs., Inc., 458
F.2d 1082, 1104 (2d Cir. 1972).  See also SEC v. Sierra Brokerage Servs. Inc., 608 F. Supp.

demonstrates, that proposition is without foundation.  The amount a court may

order a wrongdoer to disgorge may not exceed the total amount of gain from the

illegal action, but that does not entail that the gain must personally accrue to the

wrongdoer.  As our consideration of the tipper context demonstrates, to so limit

the power of courts to order disgorgement would permit evasion of the

prohibition on insider trading by allowing the direction of benefits to

acquaintances.

---

2d 923, 968 (S.D. Ohio 2009), quoting Great Lakes Equities and citing Blavin to support
the proposition that, by controlling Sixth Circuit precedent, a violator can be ordered to
disgorge the entire amount of profits.  Outcomes in the Ninth Circuit suggest that a
defendant's obligation to disgorge all profits depends upon the defendant's level of
responsibility for the unlawful enrichment.  Where an unjustly enriched defendant was
unaware of the illicit conduct of the wrongdoing third party, the court limited the
disgorgement to an amount "approximately equal to the unjust enrichment" enjoyed by
the defendant.  Hateley v. SEC, 8 F.3d 653, 656 (9th Cir. 1993).  However, where a
defendant had violated securities laws and enjoyed "substantial personal benefit from
the infusion of the illegally obtained proceeds" into a third party's account, the court
concluded the violator could be required to disgorge the total profit from the illegal
conduct.  SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 (9th Cir. 1998).  In contrast, the
Fifth Circuit has vacated a district court's order that individual, knowing participants in
an illegal securities scheme disgorge amounts beyond their personal gain, limiting each
violator's disgorgement to "the amount of the fee realized by each defendant for his
assistance in executing the fraud."  SEC v. Blatt, 583 F.2d 1325, 1336 (5th Cir. 1978).  The
Fifth Circuit stated "[t]he court's power to order disgorgement extends only to the
amount with interest by which the defendant profited from his wrongdoing.  Any
further sum would constitute a penalty assessment."  Id. at 1335.

Moreover, limiting disgorgement amounts to the direct pecuniary benefit enjoyed by the wrongdoer would run contrary to the equitable principle that the wrongdoer should bear the risk of any uncertainty affecting the amount of the remedy. A wrongdoer's unlawful action may create illicit benefits for the wrongdoer that are indirect or intangible. Because it would be difficult to quantify the advantages of an enhanced reputation or the psychic pleasures of enriching a family member, to require precise articulation of such rewards in calculating disgorgement amounts would allow the wrongdoer to benefit from such uncertainty. As our precedents make clear, the risk of uncertainty in the amount of disgorgement is not properly so allocated. See First Jersey, 101 F.3d at 1475; Patel, 61 F.3d at 140. That is not to say the amount of disgorgement a court can order from a wrongdoer is bounded only by the court's discretion; to the contrary, it is set at the maximum of the total gain from the illicit action. Here, that is precisely that amount of gain that the district court ordered disgorged. Contorinis wishes us to replace that limit on disgorgement amounts – established both by precedent and by the logic of disgorgement – with a new principle that would limit the maximum disgorgement amount to the direct pecuniary benefit to the wrongdoer. We decline to do so.

20

Contorinis further argues that our recent decision in his criminal appeal limiting the extent of the criminal forfeiture to his personal gain, <u>Contorinis</u>, 692 F.3d at 147-148, should be applied in the civil disgorgement context. That argument is unavailing. As we noted in deciding Contorinis's criminal appeal, criminal forfeiture "serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners." <u>Id</u>. at 146, quoting <u>United States v. Bajakajian</u>, 524 U.S. 321, 332 (1998). Disgorgement, in contrast, is a civil remedy which serves the remedial purpose of preventing unjust enrichment.

Thus, while both criminal forfeiture and disgorgement serve to deprive wrongdoers of their illicit gain, the two remedies reflect different characteristics and purposes – disgorgement is an equitable remedy that prevents unjust enrichment, and criminal forfeiture a statutory legal penalty imposed as punishment. <u>See</u> <u>SEC v. Lorin</u>, 869 F. Supp. 1117, 1121 (S.D.N.Y. 1994) ("I will not label disgorgement a 'fine, penalty, or forfeiture' in light of the operation of disgorgement, which merely deprives one of wrongfully obtained proceeds"), citing <u>Tex. Gulf Sulphur</u>, 446 F.2d at 1308; <u>see also</u> <u>SEC v. Williams</u>, 884 F. Supp. 28, 30-31 (D. Mass. 1995) (holding the same and collecting cases). One

21

ramification in particular of this qualitative divergence between disgorgement and criminal forfeiture nullifies Contorinis's argument.  As disgorgement is designed to equitably deprive those who have obtained ill-gotten gains of enrichment, it may be imposed upon innocent third parties who have received such ill-gotten funds and have no legitimate claim to them.  Cavanagh I, 155 F.3d at 136, citing SEC v. Colello, 139 F.3d 675, 677 (9th Cir. 1998).  That is consistent with disgorgement's remedial purpose – disgorgement is imposed not to punish, but to ensure illegal actions do not yield unwarranted enrichment even to innocent parties.

However, unjust enrichment may also be prevented by requiring the violator to disgorge the unjust enrichment he has procured for the third party.  As our case law has indicated (and as our opinion here confirms), when third parties have benefitted from illegal activity, it is possible to seek disgorgement from the violator, even if that violator never controlled the funds.  The logic of this, as more fully articulated *supra*, is that to fail to impose disgorgement on such violators would allow them to unjustly enrich their affiliates.  Thus, ordering a violator to disgorge gain the violator never possessed does not operate to magnify penalties or offer an alternative to fines, but serves disgorgement's core

22

remedial function of preventing unjust enrichment.  District courts possess the equitable discretion to determine whether disgorgement liability should fall upon third parties or violators, a responsibility concordant with the district courts' broad discretion to assay disgorgement more generally.

Moreover, unlike disgorgement, which is a discretionary, equitable remedy, criminal forfeiture is mandatory, and a creature of statute.  Thus, unlike the criminal forfeiture case, the district court's discretion in determining disgorgement is not confined by precise contours of statutory language, but rather serves the broader purposes of equity.  There is nothing inequitable about requiring a person who created an unjust gain by fraudulently trading on material nonpublic information, and allocated that gain, for reasons of his own, to beneficiaries that he chose, to return that gain to the public by disgorging the illegal benefits he obtained and directed.

Therefore, the substantive distinctions between the liability imposed by the disgorgement remedy and the criminal forfeiture penalty, and the subsequently differing impacts on violators, reflect the diversity of corrective action necessary to enforce the securities regime.  As forfeiture is punitive in nature, it would be irrational to impose it upon innocent third parties, whereas disgorgement's

purpose – the prevention of unjust enrichment – would be thwarted if securities law violators were able to pass their illicit gains off to affiliates.  To expect the same outcomes from legal concepts with such different characteristics is unrealistic, and Contorinis's efforts to analogize his criminal forfeiture penalty and disgorgement remedy are unavailing.

We therefore conclude that the district court did not abuse its discretion in requiring Contorinis to disgorge profits of $7,260,604 obtained by the Paragon Fund through his illegal insider trading.

II.    Payment of Prejudgment Interest

Contorinis additionally challenges the district court's order requiring him to pay $2,417,940 in prejudgment interest, reflecting interest that has accrued on the entire disgorgement amount.  A decision to grant prejudgment interest is "confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion."  Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071-72 (2d Cir. 1995), quoting Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 613-14 (2d Cir. 1994).  The decision to award prejudgment interest is governed by the equities, reflecting "considerations of fairness" rather than "a rigid theory of compensation," Blau v.

24

Lehman, 368 U.S. 403, 414 (1962), and we have concluded that the failure of

securities law violators to enjoy a profit "does not, standing alone, make it

inequitable to compel them to pay interest."  Rolf v. Blyth, Eastman Dillon & Co.,

Inc., 637 F.2d 77, 87 (2d Cir. 1980).

Prejudgment interest on a disgorgement amount is intended to deprive the

wrongdoer of the benefit of holding the illicit gains over time by reasonably

approximating the cost of borrowing such gain from the government.  First

Jersey, 101 F.3d at 1476.  Our cases suggest, and Contorinis acknowledges,

Appellant's R. Br. at 22, that the amount on which a violator must pay

prejudgment interest usually tracks the amount that the party is ordered to

disgorge.  Whether or not a party personally enjoyed the gains from the illegal

action does not alter this principle, see, e.g., Warde, 151 F.3d at 50 (prejudgment

interest awarded on entire amount of gain from violator's wrongdoing, even

though he did not enjoy that amount directly), and courts have required tippers

who have been ordered to disgorge their tippees' gains – the very context to

which we have analogized Contorinis's conduct in our analysis *supra* – to pay

prejudgment interest on those gains.  See, e.g., SEC v. Aragon Capital Mgmt.,

LLC, 672 F. Supp. 2d 421, 444-45 (S.D.N.Y. 2009), rev'd on other grounds and

aff'd in relevant part, <u>SEC v. Rosenthal</u>, 650 F.3d 156, 157 n.1 (2d Cir. 2011); <u>SEC v. Tome</u>, 638 F. Supp. 638, 639-40 (S.D.N.Y. 1986).  As we have discussed above, it is within the district court's equitable discretion to order Contorinis to disgorge the Paragon Fund's gains even though he did not personally enjoy them, and for parallel reasons we detect no abuse of discretion by the district court in ordering him to pay prejudgment interest on that amount.

III.    <u>Injunction against Future Violation of Securities Laws</u>

Finally, Contorinis appeals from the district court's decision to permanently enjoin him from future violations of the securities laws.  We review a district court's decision regarding imposition of such injunctive relief for abuse of discretion.  <u>SEC v. Bausch & Lomb, Inc.</u>, 565 F.2d 8, 18 (2d Cir. 1977).  Here, the district court reviewed the standard by which injunctions are applied, assessed Contorinis's conduct – noting in particular that his offense consisted of multiple profitable illegal trades made over the course of several weeks – and deemed that an injunction was appropriate.[6]  We furthermore observe that Contorinis

---

[6] District courts are more likely to deem injunctive relief inappropriate when sentencing relatively naive offenders whose illegal behavior does not suggest calculating and carefully premeditated fraud.  <u>See</u>, <u>e.g.</u>, <u>SEC v. Yun</u>, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) (denying injunctive relief where defendant was wife of executive who tipped friend regarding possible stock price changes in husband's

continues to deny having engaged in insider trading, Joint App. at 286,

suggesting a lack of remorse and supporting further measures to deter future

wrongdoing of a like type.[7]  We thus identify no abuse of discretion in the district

court's decision.

## CONCLUSION

Because the district court did not abuse its discretion in ordering

disgorgement, calculating the disgorgement amount, granting prejudgment

interest on the disgorgement amount, and imposing a permanent injunction

prohibiting Contorinis from future violations of the securities laws, the judgment

of the district court is hereby AFFIRMED.

---

company at a party).  In contrast, Contorinis is an investment professional who engaged
in a sophisticated scheme of insider trading with multiple episodes.

[7]  Contorinis argues that the district court's statements at his criminal sentencing, Joint
App. at 343-44, that "I don't think there is any chance that you are going to commit
crimes in the future" and that his insider trading scheme was "relatively isolated,"
suggest that the injunction imposed at his civil trial comprised an abuse of discretion.
However, these statements must be read in the context of a criminal sentencing
proceeding in which the court was considering possible grounds for leniency in
sentencing, not the need to impose a civil injunction.